**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SANTANU DAS, | |
| Plaintiff, | Case No. |
| v. | |
| TATA CONSULTANCY & AMIT BAJAJ, individually. | **Trial by jury demanded.** |
| Defendants. | |

## COMPLAINT AT LAW

COMES NOW Plaintiff, SANTANU DAS, through his attorneys, Case + Sedey, LLC, and for his Complaint at Law against Defendants states as follows:

### JURISDICTIONAL STATEMENT

1. Plaintiff Santanu Das (hereinafter "Plaintiff") is and was at all relevant times a resident of Woodridge, Dupage County, Illinois.

2. Defendant Tata Consultancy Services – North America (hereinafter "Defendant") is an Indian multinational information technology services and consulting company. Defendant has its headquarters in New York and is a citizen of that state. Defendant does business in Chicago, Cook County, Illinois.

3. Defendant Amit Bajaj is and was at all relevant times a citizen of Sweden who resides in Switzerland. At all relevant times, Defendant Bajaj supervised employees, including Plaintiff, in Naperville, DuPage County, Illinois.

4. This Court has diversity jurisdiction in this case pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

5. At all relevant times Plaintiff worked from Defendant Tata's Naperville, Illinois office and, thus, was an "employee" entitled to the protections of the Illinois Wage Payment and Collection Act.

6. At all relevant times, Defendants were "employers" as defined by the Illinois Wage Payment and Collection Act.

**FACTS**

7. Plaintiff began working for Defendant Tata in September 2010 as a sales associate.

8. Defendant Tata promoted Plaintiff twice, most recently in or around August 2020 to the role of Regional Leader.

9. Plaintiff consistently met and/or exceeded the company's performance expectations.

10. Because his was a sales position, Defendant Tata gave Plaintiff and other sales associates incentive compensation agreements each year. These agreements contained detailed formulas for calculation of incentive compensation. Defendant Tata's leaders consistently told Plaintiff and the other salespeople that their incentive compensation would be paid out in accordance with the formulas contained in the Plans. Until 2021, Defendant paid Plaintiff and others the exact amounts owed to them per the Plans' calculations.

11. In or around March 2020, Defendant Bajaj became Defendant Tata Consultancy's President of North America. In this role, Defendant Bajaj served as Head of Sales for the company.

12. In or around April 2020, Defendant Bajaj announced that he was retroactively reducing salespeople's bonuses by 20% for FY 2020. He claimed this was because of Covid,

however, Covid had just begun and had not yet impacted business. Per the terms of the Plan, Plaintiff was to be paid his FY 2020 incentive compensation in June 2020. Per the terms of the Plan, Defendant Tata owed Plaintiff $109,100 in incentive compensation but paid him only $87,280. This left a $21,820 deficit. Attached as Exhibit A is a copy of the FY 2020 Compensation Plan.

13. In or around August 2020, Defendant Bajaj began a new initiative he called Sales Swat Tribe ("SST") in which he invited the company's top salespeople to participate. Defendant Bajaj gave each salesperson several accounts and tasked them with growing them. Because Plaintiff was a top salesperson, Defendant Bajaj assigned him the Walmart, Meijer and T-Mobile accounts. The total revenue for those three accounts was $68.8M. Plaintiff was expected to grow these accounts in addition to continuing to perform his duties as a Regional Leader. Defendant Bajaj told Plaintiff that his sales incentive for the year would be tagged to SST instead of his Regional Leader role. As such, Defendant gave him an SST Sales Incentive Plan that included several levels of incentive awards, with a maximum potential incentive of $432,040. Attached as Exhibit B is a copy of the FY 2021 SST Incentive Plan.

14. Plaintiff had a base sales target of $68.8M, which was what Defendant Tata had earned from the targeted accounts the prior fiscal year. In addition, the Plan included an "overachiever target" of an additional $40M with incremental compensation awards for excess achievement beyond that threshold.

15. By the end of the year, Plaintiff had eclipsed his target numbers by increasing revenue from $68.8M to $141M. This was $72M more than the prior year and $32.2M more than the Plan's overachievement target. According to the Plan, Defendant Tata should have paid Plaintiff the maximum incentive compensation of $432,040 for meeting and then wildly exceeding

his goals. Instead, in June 2021, Defendant paid Plaintiff only $97,000 with no explanation as to why. This left a deficit of $335,040 in incentive compensation owed to Plaintiff.

16. After receiving far less than what was owed to him, Plaintiff reached out to his supervisor, Vice President Sanjeev Khanna, to ask why his compensation was so much lower than he had expected. Mr. Khanna could not provide an explanation. Plaintiff also questioned others, all of whom could not provide a reason and many of whom agreed the reduction was unfair.

17. Soon after Plaintiff began questioning Defendants' failure to pay his full incentive compensation, on or around, April 2022, Defendant removed Plaintiff from his Regional Leader, demote him to a regular sales role and replaced him with a far less experienced employee.

18. For FY 2022 year, Defendants gave Plaintiff and others their incentive compensation plans. Attached as Exhibit C is a copy of that Plan. This Plan covered the period from April 2022 to March 31, 2023.

19. From April 2022 to October 2022, Plaintiff secured approximately $60M in new business for Defendant which was the largest deal in the Central region. Per the terms of the Plan, Plaintiff should have been paid approximately $123,000 in incentive compensation.

20. Plaintiff resigned his employment on October 13, 2022. He requested that Defendant pay him his 2022 outstanding earned incentive compensation. Defendants, however, refused.

## COUNT I
## VIOLATION OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT
## AGAINST DEFENDANT TATA CONSULTANCY SERVICES

21. Plaintiff incorporates paragraphs 1-20 as though fully stated in this Count I.

22. The FY 2020, 2021 and 2022 unpaid incentive compensation amounts are "wages" as defined by the Illinois Wage Payment and Collection Act.

23. Defendants violated the Illinois Wage Payment and Collection Act by intentionally refusing to pay these earned wages.

24. As a result, Plaintiff has suffered more than $400,000 in lost wages.

WHEREFORE, Plaintiff respectfully requests that this court enter an order finding that Defendants violated the Illinois Wage and Collection Act and award him: 1) all unpaid wages 2) 5% per month interest on all past due amounts and 3) attorneys' fees and costs incurred in bring this action.

## COUNT II
## UNJUST ENRICHMENT

24. Plaintiff incorporates by reference the preceding paragraphs 1-20 as though fully set forth in this Count II.

25. Despite promising him certain incentive compensation amounts, Defendant has unjustly retained more than $400,000 in earned compensation it owes to Plaintiff.

28. Defendant's retention of these wages violates the fundamental principles of justice, equity, and good conscience in that this incentive compensation comprised the majority of Plaintiff's compensation.

WHEREFORE Plaintiff respectfully requests that this Court;

A. Enter an order finding that Defendant has unjustly retained Plaintiff's earned wages;

B. Award Plaintiff all unpaid compensation.

C. Award Plaintiff all other further relief this Court deems appropriate.

## COUNT III
## RETALIATION IN VIOLATION OF THE
## ILLINOIS WAGE PAYMENT AND COLLECTION ACT

25. Plaintiff incorporates paragraphs 1-20 as though fully stated in this Count III.

26. In June of 2021 Plaintiff began complaining internally about his unpaid wages. Soon after that, Defendant demoted him from his Regional Leader role and moved him back to a sales role.

27. Prior to this, Plaintiff's performance had consistently exceeded expectations and there was no justification for this action.

28. Instead, Defendant took this action in retaliation against Plaintiff for complaining about unpaid wages.

29. As a result, Plaintiff has lost income associated with his regional leader role. He has also suffered emotional distress damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgement in his favor and against Defendants for lost wages and benefits, emotional distress and punitive damages and for all fees and costs incurred as a result of bringing this Action.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues herein.

Respectfully Submitted,

SANTANU DAS

By: /s/ *Kristin M. Case*
 One of His Attorneys

Kristin M. Case
Kate Sedey
Case + Sedey, LLC
250 South Wacker Dr., Ste. 230
Chicago, Illinois 60606
Tel. (312) 920-0400
Fax (312) 920-0800
Bar ID No. 6274676



April 26, 2019
TCS Confidential/ EE# 373716

**Plan Type:** FY20 MMU Sales Incentive Plan
**Plan Period:** April 1, 2019 to March 31, 2020
**Geography:** USA and Canada

| Name: Santanu Das | Role: Head of Sales - TTH |
|---|---|
| Unit: MMU - TTH | Sales/Business Head: Sanjeev Khanna |

Potential Incentive for the 12 month schedule : 154,300
Prorated Potential Incentive from April 01,2019 through March 31, 2019 : 154,300
Maximum Earning Potential : 432,040

| Measure | Weightage | Range / Achievement | Calculation | Potential Incentive |
|---|---|---|---|---|
| TCV Achievement | 55 % | Tier 1: 0% to 74.99 % | Awards 1% of the individual OTE for this measure for every % of Revenue target achieved | 84,865 |
| | | Tier 2: 75 % to 99.99% | Pays Tier 1 Awards for this measure, then 2.25% of the individual OTE for this measure for every % achieved over 74.99% up to 99.99% achievement of target | |
| | | Tier 3: 100% to 124.99% | Pays Tier 2 Awards for this measure+15% of OTE for this measure upon 100% target achievement, then 2.75% of OTE for this measure for every % achieved over 100% up to 124.99% to a maximum of three times the OTE applicable for the measure | |
| | | Tier 4: >=125% | Pays Tier 3 Awards for this measure, then 3% of OTE for this measure for every % achieved for 125% and above up to a maximum of three times the OTE applicable for the measure | |
| **Revenue Achievement FY20 Accounts | 15 % | Tier 1: 0% to 79.99% | Awards 1% of the individual OTE for this measure for every % of Revenue target achieved | 23,145 |
| | | Tier 2: 80% to 99.99% | Pays Tier 1 Awards for this measure, then 2.25% of the individual OTE for this measure for every % achieved over 80% up to 99.99% achievement of target | |
| | | Tier 3: 100% to 124.99% | Pays Tier 2 Awards for this measure+15% of OTE for this measure upon 100% target achievement, then 2.75% of OTE for this measure for every % achieved over 100% up to 124.99% to a maximum of three times the OTE applicable for the measure | |
| | | Tier 4: >=125% | Pays Tier 3 Awards for this measure, then 3% of OTE for this measure for every % achieved for 125% and above up to a maximum of three times the OTE applicable for the measure | |
| **Revenue Achievement FY19 Accounts | 20 % | Tier 1: 0% to 99.99% | Awards 1% of the individual OTE for this measure for every % of Revenue target achieved | 30,860 |
| | | Tier 2: 100% to 124.99% | Pays Tier 1 Awards for this measure+ 10% of OTE for this measure upon 100% target achievement, then 2.25% of OTE for this measure for every % achieved over 100% up to 124.99% to a maximum of three times the OTE applicable for the measure | |
| | | Tier 3: >=125% | Pays Tier 2 Awards for this measure + 2.5% of OTE for this measure for every % achieved for 125% and above up to a maximum of three times the OTE applicable for the measure | |
| Performance Band | 10 % | A | 100% of OTE for Measure | 15,430 |
| | | B | 75% of OTE for Measure | |
| | | C | 50% of OTE for Measure | |
| | | D | 0% of OTE for Measure | |

EXHIBIT A

**Targets for the period April 2019 through March 2020**

| Measures | H1 | H2 | Annual (Prorated) |
|---|---|---|---|
| TCV Achievement | 70,000,000 | 90,000,000 | 160,000,000 |
| Revenue Achievement from FY20 Accounts | 4,170,000 | 6,670,000 | 10,840,000 |
| Revenue Achievement from FY19 Accounts | 3,710,000 | 6,170,000 | 9,880,000 |

** Incentive will factor in multiplier for Digital Revenue, which is as follows:

- ➢ A multiplier of 125% will be considered for digital revenue from all deals
- ➢ The multiplier will be 150% for digital revenue from specific focus service lines : A&I, Blockchain, Digital Interactive, and IoT
- ➢ Digital revenue will be determined from revenue register with 'Digital Flagging' as 'Y'

- Eligibility of these funds is based on numerous factors, including but not limited to the success of the business in achieving its earning goals, as well as by the individual contribution of each employee to business goals, as determined by business management. This is not intended to make up for or add to an employee's regular rate of pay or compensation for meeting the minimum standards of the job position.

- To the extent an incentive bonus is given, payments will be made on a half-yearly basis for the Financial Year. For H1 awards, the half-year achievement will be measured against half-year targets, with no accelerators and no performance band component applied. The total achievement will be assessed against the total annual targets, applying accelerators, and including the performance band component (if applicable), and the H1 award already paid will be deducted when calculating the annual award.

- In case of employees not having revenue target or small revenue target from previous year accounts, 35% weightage will be considered for the current year revenue target (which includes small revenue target from previous year accounts, if applicable) with 0% weightage for previous year revenue target. Total revenue target should be signed off by geography head.

- Employees who voluntarily terminate their employment with TCS during the fiscal year (April 2019 through March 2020) will not be eligible for any incentive under the Plan for that year.

- Employees who are involuntarily terminated from employment with TCS prior to the close of the fiscal year will be eligible for an award as earned at the discretion of the geography head. In case of gross misconduct and/or policy violations, the employee will not be eligible for any incentive for that year.

- In case of multiple employees contributing to a deal, the TCV from the deal will be split among the managers at the discretion of the geography head.

- Employees who participate in the Plan may not participate in any other incentive scheme.

- For employees who transition to a different role within the same MMU unit during the plan year, if incentive bonuses are given, the potential incentive and targets for FY20 will be subject to review and adjustment based on the new role. For employees who move out of the MMU unit during the plan year, the potential incentive and target within the MMU SI plan will be prorated and paid for the duration of the individual's participation in the MMU SI plan for FY20, which will impact the overall SI payout. Such applicable prorated SI payment will be made after completion of FY20.

- Any incentive bonus payment made to an individual under the Plan is made at the sole discretion of the geography head, TCS Global CFO and TCS Global Head of HR. It is at the sole and total discretion of management whether there is any bonus, the amount, timing, and whether individual employees are rewarded and such determination will be based on multiple variables including, but not limited to, the associate and the unit's contribution. It should not be assumed that past payments have established a pattern for future payments.

- Incentives and payments will be based on many factors, including but not limited to the overall performance of TCS and is not part of the employee's salary.

- TCS reserves the right to withdraw, and/or not renew, this Plan. TCS also reserves the right to change the Plan design, governance structure, procedure or model at any time. Any changes will be duly communicated to all plan participants.

- Payments under this Plan is subject to the company's discretion. It does not create a contract between you and TCS and it does not affect that at-will nature of your employment. All employment with TCS is at-will. This means either you or TCS may terminate your employment at any time for any reason with or without cause and with or without prior notice.

**Warm regards and best wishes,**


**Narasimhan Srinivasan**
**Vice President, Head - Human Resources, North America**

EXHIBIT B



August 22, 2020
TCS Confidential/ EE# 373716

**Plan Type:** FY21 Sales Incentive Plan for SST (Sales SWAT Tribe)
**Plan Period:** April 1, 2020 to March 31, 2021
**Geography:** USA

| Name: Santanu Das | SST Role: Client Pack Anchor |
|---|---|

Potential Incentive for the 12-month schedule : $ 154,300
Prorated Potential Incentive from April 01, 2020 through March 31, 2021 : $ 154,300
Maximum Earning Potential : $ 432,040

| Measure | Weightage | Range / Achievement | Calculation | Potential Incentive |
|---|---|---|---|---|
| Base Line TCV Target (Component A) | 50% | 0% to 100% | Awards 1% of the individual OTE for this measure for every % upto 100 % of the Baseline TCV Target achieved | $ 77,150 |
| FY 21 Over-achievement TCV Target (Component B) | 50% | Tier 1: 0% to 49.99% | Awards 1% of the individual OTE for this measure for every % of Target achieved upto 49.99% | $ 77,150 |
| | | Tier 2: 50% to 79.99% | Pays Tier 1 Awards for this measure, then 1.5% of the individual OTE for this measure for every % achieved over 50% up to 79.99% achievement of target | |
| | | Tier 3: 80% to 99.99% | Pays Tier 2 Awards for this measure, then 2.25% of the individual OTE for this measure for every % achieved over 80% up to 99.99% achievement of target | |
| | | Tier 4: 100% to 149.99% | Pays Tier 3 Awards for this measure, then 2.75% of the individual OTE for this measure for every % achieved over 100% up to 149.99% achievement of target + 15% of OTE | |
| | | Tier 5: > 150 % | Pays Tier 4 Awards for this measure, then 5% of OTE for this measure for every % achieved for 150% and above up to a maximum of 4.6 times the OTE applicable for the measure | |

**SST Targets for the period April 2020 through March 2021**

| Measures | H1 | H2 | Annual (Prorated) |
|---|---|---|---|
| Baseline TCV Target | $ 34,441,931 | $ 34,441,931 | $ 68,883,862 |
| FY 21 Over-achievement TCV Target | $ 16,000,000 | $ 24,000,000 | $ 40,000,000 |
| FY20 SST Performance Baseline for the tribe | | | $2,420,750,000 |

TATA CONSULTANCY SERVICES
Tata America International Corporation
101 Park Avenue, New York New York 10178
Tel: 646-313-4560; Fax: 212-867-8652

Scanned with CamScanner



- Employees who participate in the Plan may not participate in any other incentive scheme; any previously issued incentive plans will be considered null and void.

- The combined payout from the Component A, Component B will be capped to the Max Earning Potential.

- Additionally to the above-mentioned, the employee is also eligible to earn Component D, upto a maximum of USD 100,000 calculated at: 0.05% of the over-achievement on the FY20 SST Performance Baseline for the tribe, which is distributed equally between all SST Client Pack Anchors.

- Eligibility of these funds is based on numerous factors, including but not limited to the success of the business in achieving its earning goals, as well as by the individual contribution of each employee to business goals, as determined by business management. This is not intended to make up for, or add to, an employee's regular rate of pay or compensation for meeting the minimum standards of the job position.

- To the extent an incentive bonus is given, payments will be made on a half-yearly basis for the Financial Year. For H1 awards, the half-year achievement will be measured against half-year targets, with no accelerators applied. The total achievement will be assessed against the total annual targets, applying accelerators, and the H1 award already paid will be deducted when calculating the annual award.

- Employees who voluntarily terminate their employment with TCS during the fiscal year (April 2020 through March 2021) will not be eligible for any incentive under the Plan for that year.

- Employees who are involuntarily terminated from employment with TCS prior to the close of the fiscal year will be eligible for an award as earned at the discretion of Corporate Vice President – Markets. In case of gross misconduct and/or policy violations, the employee will not be eligible for any incentive for that year.

- For employees who transition to a different role within the same SST unit during the plan year, if incentive bonuses are given, the potential incentive and targets for FY21 will be subject to review and adjustment based on the new role. For employees who move out of the SST unit during the plan year, the potential incentive and target within this SST SI plan will be prorated and paid for the duration of the individual's participation in the SST SI plan for FY21. Such applicable prorated SI payment will be made after completion of FY21 and will be subject to the discretion of the Corporate Vice President – Markets.

- Any incentive bonus payment made to an individual under the Plan is made at the sole discretion of the Corporate Vice President – Markets, TCS Global CFO and TCS Global Head of HR. It is at the sole and total discretion of management whether there is any bonus, the amount, timing, and whether individual employees are rewarded, and such determination will be based on multiple variables including, but not limited to, the associate and the unit's contribution. It should not be assumed that past payments have established a pattern for future payments.

- Incentives and payments will be based on many factors, including but not limited to the overall performance of TCS and is not part of the employee's salary.

- TCS reserves the right to withdraw, and/or not renew, this Plan. TCS also reserves the right to change the Plan design, governance structure, procedure or model at any time. Any changes will be duly communicated to all plan participants.

- Payment under this Plan is subject to the company's discretion. It does not create a contract between you and TCS and it does not affect that at-will nature of your employment. All employment with TCS is at-will. This means either you or TCS may terminate your employment at any time for any reason with or without cause, and with or without prior notice.

Warm regards and best wishes,

*[signature]*

Anant P. Haidale
Vice President, Head - Human Resources, North America

**TATA CONSULTANCY SERVICES**
Tata America International Corporation
101 Park Avenue, New York New York 10178
Tel: 646-313-4560; Fax: 212-867-8652

Scanned with CamScanner

Aug 17, 2022
TCS Confidential/ EE# 373716

**Plan Type:**     **FY23 MMT Sales Incentive Plan**
**Plan Period:**   **April 1,2022 to March 31, 2023**

        Santanu Das

        Regional Business Development Lead (RBD)

        Market Unit - Central 2

Maximum Sales Incentive Potential (MSIP)      : $ 250,000

**SI Payout**

| # | | | |
|---|---|---|---|
| 1 | TCV* from Regional BD Stakeholder Groups** | A) Proactive deals<br>B) Margin | For Dream and CatA logos, applied as a % of the TCV after any applicable Accelerators, in a staircase manner at account level, as follows:<br>• 0.40% : upto $ 10 Mn<br>• 0.20% : over $ 10 Mn and upto $ 25 Mn<br>• 0.10% : over $ 25 Mn and upto $ 100 Mn<br>• 0.05% : over $ 100 Mn<br><br>For any large deal (TCV>$10Mn), the above staircase model will apply on a stand-alone basis (regardless of overall TCV closed in the account).<br><br>For any pre-approved Cat BCD exceptions, applied as a % of the TCV after any applicable Accelerators, in a staircase manner at account level, as follows:<br>• 0.25% : upto $ 25 Mn<br>• 0.10% : over $ 25 Mn and upto $ 100 Mn<br>• 0.05% : over $ 100 Mn<br>Applies if minimum cumulative TCV from the Cat BCD logo is $ 2 Mn, during the FY.<br><br>For any pre-approved existing (ISU) account exceptions, a % share of the Oppty TCV for BD's role in the deal will be assessed by Leadership. The following will be applied towards such % share, in a staircase manner.<br>• 0.10% : upto $ 100 Mn of the % share<br>• 0.025% : over $ 100 Mn of the % share<br>No other SI components will apply in such cases. SI Payout for any pre-approved participation in existing (ISU) account opportunities will be limited to 50% of the MSIP. |
| 2 | New Offerings *** sold | A) Proactive deals<br>B) Margin | For stand-alone New Offerings*** sold in an account:<br>0.5% of TCV upto $ 2 Mn per offering-area, per logo |

| | | | |
|---|---|---|---|
| 3 | TCV from non-RBD Stakeholder Groups** in Dream & Cat A Accounts | A) Proactive deals<br>B) Margin | 3.1) 0.02% of such TCV after any applicable Accelerators<br><br>3.2) If RBD brings demonstrated relationships with non-RBD stakeholder(s) of the oppty, that are leveraged during the pursuit cycle, then additional 0.03% of such accelerated TCV<br><br>3.3) If NS-SUL requests RBD to be the primary oppty BD for Non-RBD Stakeholder opptys, then such TCV will be accounted towards (1), and (3) will not apply |
| 4 | Dream and CatA – New Logo Acquisition | Not Applicable | Applied as a % of the Actual TCV for the first $ 10 Mn TCV from the logo, distributed among contributing MMT members, across MMT units, to the extent of individual contribution assessment<br><br>New Logo Kitty: 1% for Dream logo; 0.6% of TCV for Cat A logo<br><br>Applies if minimum cumulative TCV from the logo is $ 1 Mn, during the FY |
| 5 | Deals with TCV greater than $ 300 M | Not Applicable | 0.2% of Actual TCV (over $ 300 Mn) kitty may be distributed among the relevant contributors, over and above their MSIP limits. Total payout in such cases will be capped at $ 1 million. |

\* The quality of BDL traction with the customer will be assessed. Such assessment will take into account parameters such as meetings with non-sourcing buying stakeholders during six months before RFx, insights to various stakeholders and competitive environment, interactions with other stakeholders in the account, dependence on a TCS ally recently joining the customer, etc. Should such traction be below expectations, a lower SI credit will be applied as per management assessment.

\*\* The list of Regional BD (RBD) Stakeholder Groups and non-RBD Stakeholder Groups, is as published by MMT-PMO. Any revisions to the list will be published by MMT-PMO, as and when decided by management ,
Teams NA MMT++ > Onboarding and Leadership Comms > Stakeholder Groups

\*\*\* The list of offerings to be considered comprises of advisory and/or implementation services, and is provided in
  Teams NA MMT++ > Onboarding and Leadership Comms > MMT-New Offerings

**TCV Accelerators**

The above-mentioned TCV Accelerators will be applied as below

| | | | |
|---|---|---|---|
| A | Proactive | Tier 1 : $5 M to $ 20 M TCV | 1.5 x Actual TCV |
| | | Tier 2 : Greater than $ 20 M TCV | Tier 1 + ( 1.25 x Actual TCV ) |
| B | Margin | Gross Margin(GM) Less than: Lower threshold of 27% | 10 % reduction in Actual TCV for every 2.5% reduction in GM, capped to 50% of the TCV value |
| | | Gross Margin(GM): More than: Upper threshold of 40% | 10 % increase in Actual TCV for every 2.5% increase in GM, capped to 50% of the TCV value |

- (A) and (B) would only be applicable for deals which are $ 5 M or higher.
- For (A), the deal selling should be proactively done with sole-sourced closure, excludes incremental extensions of existing work and will be validated by relevant MUL/SUL
- For (B), Gross Margin would be determined and agreed for the final submission of pricing to customer between the Sales and Business Unit on the date of contract execution/closure of CRM and on the sales values executed in the contract/CRM

- The total SI payout will be capped at the Maximum Sales Incentive Potential (MSIP)
- Should any member of the MMT need formal support from another member(s) of MMT, the reward for the same can be recognized by sharing a certain % TCV Credit to the member(s) providing support, to be reviewed and approved through the governance process. In such cases, the TCV Credit to be shared needs to be a minimum of $ 5 M. The payout given to such added supporting MMT members, will follow the payout guideline of the MMT member who is sharing the TCV. Supervisory rollups of the respective TCV percentage will happen to the extent the TCV sharing is within either the Market Units, or within the Sales Units, but not across.
- CY Logo: MMT GTU logo acquired in the current Financial Year. PY Logo: MMT GTU logo acquired in the previous Financial Year.
- TCV computation in a T&M contract: In a T&M contract, there are three variables, which influence TCV; Rate, FTE volume and Value for a given scope of work. Two of these 3 variables are to be present in a T&M contract along with details on the work in order to qualify for TCV. TCV for SI is evaluated based on the actual FTEs/Rev by end of the current FY year and if ramp-up is not as planned (actual FTEs/Rev are significantly different than estimated as specified in SOW), the TCV will be re-evaluated at the end of the financial year for the current year as well as for future years.
- Employees must be actively employed by TCS on the date when sales incentives are paid in order to be eligible for a sales incentive payment. Thus, employees who voluntarily terminate their employment or are terminated for cause prior to the date when sales incentives are paid will not be eligible for any sales incentive under the Plan for that year.
- However, employees who are involuntarily terminated from employment with TCS before the sales incentive is paid may be eligible for an award in lieu of a sales incentive payment at the discretion of MMT management.
- For employees who transition to a different role within and outside MMT within the plan year will be awarded pro-rated Sales Incentive payment based on pro-rated target and potential incentive for their period of plan participation as per the discretion of MMT management.
- Any sales incentive payment made to an individual under the Plan is made at the sole discretion of the MMT Management, TCS Global CFO and TCS Global Head of HR. It is at the sole and total discretion of management whether there is any overall sales incentive payment, the amount, timing, and whether individual employees are rewarded, and such determination will be based on multiple variables including, but not limited to, the associate and the unit's contribution as well as overall TCS performance. It should not be assumed that past payments have established a pattern for future payments.

- Payment under this Plan is subject to the company's discretion. It does not create a contract between you and TCS and it does not affect that at-will nature of your employment. All employment with TCS is at-will. This means either you or TCS may terminate your employment at any time for any reason with or without cause, and with or without prior notice.
- TCS reserves the right to withdraw, modify and/or not renew, this Plan. Any changes will be duly communicated to all plan participants.

Warm regards and best wishes,

*Ritu Anand*

**Dr. Ritu Anand**
**SVP & Head**
**Leadership and Diversity**