IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SANTANU DAS, ) | |
| ) | No. 22 C 6988 |
| *Plaintiff*, ) | |
| v. ) | Judge Virginia M. Kendall |
| ) | |
| TATA CONSULTANCY SERVICES, LTD. ) | |
| and AMIT BAJAJ, ) | |
| ) | |
| *Defendants*. ) | |

**MEMORANDUM OPINION AND ORDER**

Each year that Plaintiff Santanu Das worked as a salesperson for Defendant Tata Consultancy Services, he received an incentive plan. Das claims that Tata and its president, Defendant Amit Bajaj, failed to pay him a bonus under the incentive plan. This Court has already dismissed Das's original complaint for failure to state a claim. (Dkt. 22). In his Amended Complaint, Das repleads his three rejected claims and throws in two new ones. He alleges breach of contract (Count I), violations of the Illinois Wage Payment and Collection Act (IWPCA) (Counts II & V), fraudulent misrepresentation (Count III), and unjust enrichment (Count IV). (Dkt. 23). Again, Tata moves to dismiss. (Dkt. 29). For the reasons below, Defendants' motion to dismiss is granted.

**BACKGROUND**

The Court assumes familiarity with the facts of this case from its previous Opinion. *Das v. Tata Consultancy Servs., Ltd.*, 2023 WL 3627714 (N.D. Ill. May 24, 2023). Tata hired Das as a sales associate in September 2010. (Dkt. 23 ¶ 7). Das received a promotion to the role of regional leader in August 2020, his second promotion at the company. (*Id.* at ¶ 8). Every year, Tata issued incentive plans to its salespeople, and then paid them according to the formulas in the plans. (*Id.*

1

at ¶ 9). Around March 2020, Amit Bajaj became Tata's president and head of sales in North America. (*Id.* at ¶ 10). One month later, in April 2020, Bajaj announced a new sales initiative called "Sales Swat Tribe" (SST) with a new associated incentive plan. (*Id.* at ¶¶ 11, 13). Bajaj invited "a select few of the company's top salespeople," including Das, to participate in the SST initiative. (*Id.* at ¶ 12).

Bajaj and Tata's managers held weekly calls with SST salespeople in which they discussed compensation under the SST incentive plan. (*Id.* at ¶ 13). Bajaj explained that SST salespeople "would receive percentages of revenue increases . . . with the percentages increasing based upon the volume of growth." (*Id.*) Bajaj and others "continually" assured the salespeople that "if they met certain targets, they would receive certain compensation." (*Id.*). At these meetings, Bajaj never disclaimed the existence of a contract or described the incentive plan as discretionary. (*Id.*). Based on the verbal representations in the meetings, Das alleges that, "in or around April 2020," he "accepted [Defendants'] offer by beginning to work toward meeting the SST objectives." (*Id.* at ¶¶ 13, 23). Later, in a virtual meeting on August 13, 2020, Tata shared PowerPoint slides confirming a "baseline target" and an "overachievement target"—summarizing Bajaj's past representations. (*Id.* at ¶ 14; Dkt. 23-1). The PowerPoint presentation did not include a contract disclaimer or discretionary language. (Dkt. 23 ¶ 14).

On August 22, 2020, Tata emailed Das a written version of the SST incentive plan—including contract disclaimers and discretionary language. (*Id.* at ¶¶ 15–16). The SST plan stated, in part:

> Any incentive bonus made to an individual under the Plan is made at the sole discretion of the Corporate Vice President – Markets, TCS Global CFO, and TCS Global Head of HR. It is at the sole and total discretion of management whether there is any bonus, the amount, timing, and whether individual employees are rewarded . . . . It should not be assumed that past payments have established a pattern for future payments. . . . TCS reserves the right to withdraw, and/or not

2

>renew, this Plan. . . . Payment under this Plan is subject to the company's discretion. It does not create a contract between you and TCS . . . .

(Dkt. 23-2 at 2).

Under the written plan, Das could receive a maximum potential bonus of $432,040. (Dkt. 23 ¶ 18; Dkt. 23-2 at 1). Although Das exceeded the plan's highest target, he received a bonus of $97,000 in June 2021. (Dkt. 23 ¶ 18). When Das asked Tata vice president Sanjeev Khanna why his bonus was lower than he expected, he received no explanation. (*Id.* at ¶ 20). Around April 2022, Tata demoted Das and replaced him with a less experienced employee. (*Id.* at ¶ 21).

Das sued Tata and Bajaj on December 13, 2022, alleging an IWPCA violation, retaliation under the IWPCA, and unjust enrichment. (Dkt. 1). On May 24, 2023, this Court dismissed Das's complaint for failure to state a claim. (Dkt. 22). In his Amended Complaint, Das now repleads his claims for IWPCA violation (Count II), IWPCA retaliation (Count V), and unjust enrichment (Count IV), and he brings new claims for breach of contract (Count I) and fraudulent misrepresentation (Count III). (Dkt. 23 ¶¶ 22–47). Defendants move to dismiss for failure to state a claim. (Dkt. 29).

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-

pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

For claims "rest[ing] on allegations of deceptive conduct," Federal Rule of Civil Procedure 9(b) requires the plaintiff to "plead with particularity the circumstances constituting fraud." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019)); Fed. R. Civ. P. 9(b). This means the plaintiff "must identify the 'who, what, when, where, and how' of the alleged fraud." *Benson*, 944 F.3d at 646 (quoting *Vanzant*, 934 F.3d at 738).

## DISCUSSION

### I. Breach of Contract (Count I)

Conceding that the written SST incentive plan is not itself a contract, Das newly claims that Tata and Bajaj breached an oral contract. (Dkt. 23 ¶¶ 22–26; Dkt. 30 at 4–8). To state a claim for breach of an oral or written contract under Illinois law, the plaintiff must allege:(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff. *Sheth v. SAB Tool Supply Co.*, 990 N.E.2d 738, 754 (Ill. App. Ct. 2013); *accord Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 667 (7th Cir. 2023). The "basic ingredients" of any valid contract are "an offer, an acceptance, and consideration." *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 522 (7th Cir. 2022) (quoting *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 151 (Ill. 2006)).

Illinois courts view oral employment contracts with skepticism: the terms must be "definite and certain" to be enforceable. *Zemke v. City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996) (citing *Tolmie v. United Parcel Serv., Inc.*, 930 F.2d 579 (7th Cir. 1991)); *see also, e.g.*, *Kolbe v. CZS Holdings LLC*, 2021 WL 4864143, at *4 (N.D. Ill. Oct. 19, 2021). A contract's terms are "definite

4

and certain if a court is able to ascertain what the parties agreed to." *Kap Holdings*, 55 F.4th at 522 (quoting *Szafranski v. Dunston*, 34 N.E.3d 1132, 1147 (Ill. App. Ct. 2015)) (cleaned up); *see also Reese v. Forsythe Mergers Grp., Inc.*, 682 N.E.2d 208, 214 (Ill. App. Ct. 1997) (explaining that an offer's material terms must be so definite "that the promises and performances to be rendered by each party are reasonably certain" (quoting *Acad. Chi. Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991))). "In addition to saving the judiciary from the very difficult task of reconstructing *ex post facto* the uncertain terms of an uncertain agreement, the requirement of a clear and definite offer prevents employers from incurring contractual liability for informal statements that were never intended to be anything more than expressions of long continuing good will and hope for eternal association." *Tolmie*, 930 F.2d at 581 (cleaned up). The test is whether an employer's alleged promise, viewed objectively, was so clear that an employee would reasonably understand it to be an offer. *Id.* (citing *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987)).

Here, Das fails to adequately plead an oral contract. To start, he has not alleged that Defendants made him an offer with certain and definite terms. Das alleges that Bajaj and others "verbally laid out the parameters of the compensation plan" during weekly calls with select salespeople. (Dkt. 23 ¶ 13). But Das's vague allegations of promises—that Das "would make at least the same and most likely significantly more," based on "percentages of revenue increases"—are anything but definite and certain. (*See id.* at ¶ 13). Nor can Das overcome the definite-and-certain hurdle with alleged assurances of "certain compensation" in exchange for meeting "certain targets." (*See id.*)

Das attempts to point to more definite terms by alleging that the August 13, 2020 PowerPoint presentation "summarized . . . Bajaj's prior verbal representations," confirming

5

percentage-based compensation for a "baseline target" and an "overachievement target." (*Id.* at ¶ 14). These PowerPoint slides, he contends, included "specific and detailed revenue percentages based upon sales increases and the maximum bonus that could be earned." (Dkt. 30 at 5). But a contract needs more: the PowerPoint presentation lacks certainty on other material terms.

At most, the presentation described how Tata planned to calculate performance-based bonuses. It did not explain exactly when the incentive plan would begin or end, nor when participants would receive compensation. *See, e.g.*, *Zemke*, 100 F.3d at 513 (affirming finding of no oral employment contract where the complaint did not allege a start date or salary); *Shelton v. Ernst & Young, LLP*, 143 F. Supp. 982, 992 (N.D. Ill. 2001) (dismissing breach-of-oral-contract claim based on failure to plead the agreement's duration or adequate consideration). Nor did the PowerPoint presentation describe the incentive plan in language plausibly suggesting Tata's intent to create binding obligations. *Cf. Kap Holdings*, 55 F.4th at 527 (holding that a plaintiff failed to allege an enforceable contract where a term sheet and oral negotiations left "a wide range of material terms undecided," and "the term sheet [spoke] in nonbinding expository language"). Although the PowerPoint slides contained specific percentages, Das's recounting does not make clear whether the earlier verbal promises—which the slides allegedly summarized—included any definite numbers.

Further undermining the plausibility of any definite and certain oral contract is the unclear timing of the purported offer and acceptance. Das alleges that Bajaj and others described the incentive plan during weekly meetings between April and August 2020. Yet, he fails to pinpoint when these promises crystalized into a certain and definite offer. *See, e.g.*, *Kolbe*, 2021 WL 4864143 at *4 (finding that a failure to specify the timing of the alleged offer and acceptance made an oral contract implausible). By the same token, Das does not say when he accepted the alleged

offer. Instead, he asserts—in conclusory fashion—that around April 2020, he "accepted [Defendants'] offer" by working to meet the incentive plan's targets. (*See* Dkt. 23 ¶¶ 13, 23). With no specific indication of what Defendants had told Das about the incentive plan by April 2020, Das's allegations are a far cry from suggesting a meeting of the minds over certain and definite terms. In short, applying the skepticism Illinois law demands of oral contracts, Das has not adequately alleged an offer and acceptance of definite and certain terms. In the absence of an enforceable oral contract, Das's breach-of-contract claim fails.

**II.     IWPCA Violation (Count II)**

Das next seeks to revive his previously dismissed claim for an IWPCA violation. (Dkt. 23 ¶¶ 27–31). Again, he fails to allege an underlying contract or employment agreement. *See Das*, 2023 WL 3627714, at *3–4. The IWPCA "provide[s] employees with a cause of action against employers for the timely and complete payment of earned wages or final compensation, without retaliation from employers." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016) (quoting *Byung Moo Soh v. Target Mktg. Sys., Inc.*, 817 N.E.2d 1105, 1107 (Ill. App. Ct. 2004)); 820 ILCS 115/3. The IWPCA defines "wages" as "compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties." *Chagoya v. City of Chicago*, 992 F.3d 607, 624 (7th Cir. 2021) (quoting 820 ILCS 115/2). To state an IWPCA claim, an employee must show that his employer owes him compensation "pursuant to an employment agreement." *Id.* (quoting *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016)).

An "employment agreement need not be a formally negotiated contract" and "can be entirely implicit." *Id.* at 624–25 (quoting *Landers-Scelfo v. Corp. Off. Sys., Inc.*, 827 N.E.2d 1051, 1058–59 (Ill. App. Ct. 2005)). Nor must a plaintiff "plead all contract elements if [he] can plead

7

facts showing mutual assent to terms that support the recovery." *Id.* at 624 (quoting *Landers*, 827 N.E.2d at 1059); *see also Bradley v. Village of University Park*, 59 F.4th 887, 903 (7th Cir. 2023) (explaining that an "agreement" under the IWPCA "requires only a manifestation of mutual assent . . . without the formalities and accompanying legal protections of a contract" (quoting *Catania v. Loc. 4250/5050 of the Commc'ns Workers of Am.*, 834 N.E.2d 966, 972 (Ill. App. Ct. 2005))). Yet, "the IWPCA holds the employer only to its promise under the employment agreement." *Chagoya*, 992 F.3d at 624 (citing *Enger*, 812 F.3d at 570). Further, an employer's promise is not actionable unless it is "unequivocal." *Schultze v. ABN AMRO, Inc.*, 83 N.E.3d 1053, 1059–60 (Ill. App. Ct. 2017).

Since there is no express written or oral contract, Das must plausibly allege mutual assent giving rise to an implicit agreement under the IWPCA. Das's previous pleading failed to allege as much. *Das*, 2023 WL 3627714 at *3–4. His amended IWPCA claim fares no better.

The SST incentive plan provides: "Payment under this Plan is subject to the company's discretion. It does not create a contract between you and TCS . . . ." (Dkt. 23-2 at 2). The plan gave Tata "sole and total discretion" to determine "whether there is any bonus, the amount, timing, and whether individual employees are rewarded." (*Id.*). Tata "reserve[d] the right to withdraw, and/or not renew" the plan. (*Id.*). The majority view in this District is that such disclaimers dissolve an IWPCA claim by negating mutual assent. *See, e.g.*, *Wilkinson v. Acxiom Corp.*, 611 F. Supp. 3d 547, 556–57 (N.D. Ill. 2020); *Mooney v. Wyndham Worldwide Operations, Inc.*, 2014 WL 2959270, at *2 (N.D. Ill. July 1, 2014); *Brand v. Comcast Corp.*, 2013 WL 1499008, at *5 (N.D. Ill. Apr. 11, 2013); *Camilotes v. Resurrection Health Care Corp.*, 2012 WL 2905528, at *6 (N.D. Ill. July 16, 2012); *Harris v. Seyfarth Shaw LLP*, 2010 WL 3701322, at *2 (N.D. Ill. Sept. 9, 2010); *Martino v. MCI Commc'ns Servs., Inc.*, 2008 WL 3701322, at *2 (N.D. Ill. Mar. 8, 1991); *Skelton*

*v. Am. Intercont'l Univ. Online*, 382 F. Supp. 2d 1068, 1075 (N.D. Ill. 2005). The Court still finds this line of cases persuasive. *See Das*, 2023 WL 3627714, at *3. Meanwhile, Das's second campaign for the minority view is no more convincing than his first. *Cf. Wharton v. Comcast Corp.*, 912 F. Supp. 2d 655, 658–60 (N.D. Ill. 2012).

Nevertheless, Das insists that the SST plan disclaimers are irrelevant when the alleged agreement took place months prior to their introduction. In doing so, he relies on the same two Illinois appellate court decisions, *Schultze* and *Landers*, that he did in his initial complaint. The last time around, after recognizing that these decisions deserve "great weight," this Court found them both distinguishable.[1] *Das*, 2023 WL 3627714, at *4; *see KR Enters., Inc. v. Zerteck, Inc.*, 999 F.3d 1044, 1051–52 (7th Cir. 2021) ("In deciding questions of state law, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." (internal quotation omitted)).

As discussed in the context of Das's deficient breach-of-contract claim, he has not alleged that the parties mutually agreed to reasonably certain terms before Tata sent him the written incentive plan. Nor has Das shown that past practice between the parties would plausibly indicate mutual assent.[2] Das may believe that conversations about the incentive plan during weekly meetings gave rise to a binding obligation to pay a certain bonus. But his independent belief adds up to only half an agreement. Das has not pointed to any "unequivocal promise." *See Schultze*, 830 N.E.3d at 1060. So he fails to allege an IWPCA violation.

---

[1] Unlike in *Schultze*, Das has not pointed to any "unequivocal promise" of a bonus. *See Schultze*, 83 N.E.3d at 1061. Similarly, the written agreement at issue in *Landers*—in contrast to the incentive plan here—included no disclaimers or language of discretion. *See Landers*, 827 N.E.2d at 1059–60.
[2] Tata's incentive plan for the preceding year was reduced to writing and contained similar contract disclaimers and discretionary language to the written plan that Das received in August 2020. *Das*, 2023 WL 3627714, at *1; (*see also* Dkt. 1-1). If anything, past practice would undermine Das's attempt to plead mutual assent.

### III. IWPCA Retaliation (Count V)

Das's repleaded IWPCA retaliation claim also fails. The IWPCA permits recovery against an employer who has discharged an employee because he "has made a complaint to his employer . . . that he or she has not been paid in accordance with the provisions of [the] Act." *Simpson v. Saggezza, Inc.*, 2018 WL 3753431, at *4 (N.D. Ill. Aug. 8, 2018) (quoting 820 ILCS 115/14(c)). To state a claim for retaliation under the IWPCA, the plaintiff must plead that "he engaged in activity protected under the Act, that his employer took an adverse employment action against him, and a causal link exists between the two." *Dobrov v. Hi-Tech Paintless Dent Repair, Inc.*, 2021 WL 1212796, at *8 (N.D. Ill. Mar. 31, 2021) (quoting *Sloan v. Am. Brain Tumor Assoc.*, 901 F.3d 891, 894 (7th Cir. 2018)).

Courts have found that an IWPCA retaliation claim requires an underlying contract or agreement. *Wilkinson*, 611 F. Supp. 3d at 560 (collecting cases and noting the absence of "any appellate authority on point or any contrary authority"); *Reid v. Neighborhood Assistance Corp. of Am.*, 2013 WL 1087557, at *8 (N.D. Ill. Mar. 14, 2013) (finding that recovery for retaliatory discharge under the IWPCA requires a contract or agreement (citing *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012))); *see also Williams v. Keystone Peer Rev. Org., Inc.*, 2019 WL 1177951, at *5 (C.D. Ill. Mar. 13, 2019). Like his previous complaint, Das's Amended Complaint does not sufficiently allege a contract or agreement. Das still fails to point to any authority suggesting that his IWPCA retaliation claim can move forward absent an underlying agreement.

### IV. Fraudulent Misrepresentation (Count III)

For the first time in his Amended Complaint, Das raises a claim for common-law fraudulent misrepresentation. (Dkt. 23 ¶¶ 32–39).[3] To state a claim for fraud under Illinois law, a plaintiff

---

[3] At the outset, Defendants argue that Das cannot bring a fraud claim because his allegations sound in contract, rather than tort. (Dkt. 30 at 11–12). Although Illinois law would not allow Das to recover under theories of contract and

must plead with particularity: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Squires-Cannon v. Forest Preserve Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018) (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (1996)).

Generally, "misrepresentations of intention to perform future conduct, even if made without a present intent to perform," are not fraud. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill. 1989) (citations omitted)); *Sommer v. United Sav. Life Ins. Co.*, 471 N.E.2d 606, 611 (Ill. App. Ct. 1984) ("[A] misrepresentation as to a future promise or intent will not sustain an action for fraud." (collecting cases)); *see also, e.g.*, *Reschke v. Pactiv, LLC*, 2015 WL 4428631, at *4 (N.D. Ill. July 20, 2015). Yet, a narrow exception exists where the "the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *AAR Int'l, Inc. v. Vacances Heliades S.A.*, 202 F. Supp. 2d 788, 798 (N.D. Ill. 2002) (quoting *HPI*, 545 N.E.2d at 682). To prevent this exception from swallowing the rule, a plaintiff must allege some "elaborate artifice of fraud" or other "particularly egregious" deception. *Desnick v. ABC, Inc.*, 44 F.3d 1345, 1354–55 (7th Cir. 1995); *see also Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) (observing that promissory fraud is "disfavored" because it is "easy to allege and difficult to prove or disprove"). A single broken promise is not enough. *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999) ("[A] series of unfulfilled promises is better (though of course not conclusive) evidence of fraud than a single unfulfilled promise.").

---

fraud for the same conduct, *see, e.g.*, *Johnson v. George J. Ball, Inc.*, 617 N.E.2d 1355, 1361 (Ill. App. Ct. 1993), the Court is not aware of any rule against pleading contract and fraud claims in the alternative. Regardless, the point is moot because none of Das's claims survive dismissal.

Here, Das alleges no more than a single broken promise. He does not attempt to argue that Tata's alleged deception was "particularly egregious." *See Desnick*, 44 F.3d at 1354–55. And he fails to plausibly allege a fraudulent scheme—let alone with particularity. *Cf. Sommer,* 471 N.E.2d at 610–612 (finding varied and persistent misrepresentations over the course of a year established a complex scheme to defraud). Das asserts that, between April and August 2020, Bajaj and others "continually" misrepresented that Das would "receive certain compensation" for hitting "certain targets." (Dkt. 23 ¶ 13). But this indefinite allegation falls far short of the particularity necessary to plead a fraudulent scheme. Accordingly, Das's claim for fraudulent misrepresentation fails.

## V.    Unjust Enrichment (Count IV)

Illinois law does not recognize a "stand-alone claim for unjust enrichment." *Benson*, 944 F.3d at 648. The failure of Das's other claims therefore dooms his unjust-enrichment claim.

## CONCLUSION

For the reasons above, Defendants' motion to dismiss [29] is granted. Counts II, IV, and V are dismissed with prejudice since there is no indication that these claims could survive a third motion to dismiss. *See Arlin-Golf v. Village of Arlington Heights*, 631 F.3d 818, 823 (7th Cir. 2011). Counts I and III—which are new to the Amended Complaint—are dismissed without prejudice. Das may file a second amended complaint, consistent with this Opinion, by November 20, 2023. If he fails to do so, the dismissal of Counts I and III will become with prejudice.

Virginia M. Kendall
United States District Judge

Date: October 30, 2023