**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SANTANU DAS, | ) | |
| *Plaintiff*, | ) | No. 22 C 6988 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| TATA CONSULTANCY SERVICES, LTD. and AMIT BAJAJ, | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

There are three motions before the Court. Defendants Tata Consultancy Services, Ltd. and Amit Bajaj move for summary judgment (Dkt. 75) and attorneys' fees. (Dkt. 89). Plaintiff Santanu Das moves for sanctions. (Dkt. 79). For the reasons below, the Court grants Defendants' Motion for Summary Judgment (Dkt. 75) and for fees (Dkt. 89) and denies Plaintiff's Motion for Sanctions. (Dkt. 79).

**BACKGROUND**

Das was a salesman who started working for Tata in 2010. (Dkt. 82, ¶ 4). Tata separated its sales teams into groups: the Major Markets Unit and the Industry Sales Unit. (*Id.*, ¶¶ 13, 16). Prior to creating the new initiative at issue—the Sales Swat Tribe Plan—the two different units served separate functions. The Major Markets Unit was responsible for generating new clients—think cold calling. (*Id.*, ¶ 14). Whereas the Industry Sales Unit's role was to service existing clients, generating additional business from existing business. (Dkt. 88, ¶ 3). Then COVID hit.

COVID's disruption caused Tata leadership to create a new strategy for generating profits. (Dkt. 82, ¶ 18). Enter the Sales Swat Tribe Plan. (*Id.*) This new plan was conceptually simple:

merge the Major Markets and Industry Sales Units to generate new business from current customers. (*Id.*, ¶ 27). The idea behind the Sales Swat Tribe Plan was for the Major Markets Unit—whose experience was in generating new business from new clients—to learn from, and piggyback on, the Industry Sales Unit's knowledge of existing clients, to then find new ways to generate new business from these existing customers. (*Id.*) This meant that then existing profits (e.g., contracts in place), routine contract renewals (i.e., those requiring little to no real sales work), and business expansion that again required no true sales efforts, were excluded from the Sales Swat Tribe Plan. (*Id.*) That expectation was clear. (Dkt. 77-9).

Das was given the opportunity to join this plan and he accepted the offer. (Dkt. 82, ¶ 23). Amit Bajaj held a governance role in the plan. (Dkt. 88, ¶ 4). This plan, however, was massive—it spanned myriad teams, functions, and goals, going all the way up to the CEO. (Dkt. 77-1, Tr. 96:2-6).

In addition to their usual base pay, participants in the plan were given an opportunity to earn a bonus, subject to Tata's discretion. (Dkt. 77-10). The bonus incentive had two parts. (*Id.*) If a participant in the Sales Swat Tribe Plan hit their baseline total contract value, they would be eligible, subject to Tata's discretion, for a certain bonus payment. (*Id.*) If the participant exceeded their baseline target, they would be eligible, again, subject to Tata's discretion, for an "over-achievement" bonus. (*Id.*) At least for Das, the over-achievement bonus was divided into 5 weighted tiers that scaled with his level of over-achievement. (*Id.*) For example, if Das exceeded his baseline target by 1%, he would fall into Tier 1, which "[a]wards 1% of the individual OTE[1] for this measure for every % of Target achieved up to 49.99%." (*Id.* at 1). If Das were to achieve 65% over-achievement, for example, he would fall into Tier 2, which "[p]ays Tier 1 Awards for

[1] OTE stands for "on target earnings."

this measure, then 1.5% of the individual OTE for this measure for every % achieved over 50% up to 79.99% achievement of target." (*Id.*) The bonus incentive plan did not define total contract value nor on-target earnings. It also did not disclose that bonuses were subject to validation processes. (*Id.*) It did disclose numerous disclaimers that payment, if any, was subject to Tata's "sole" discretion and was based on "many factors." (*Id.* at 3). On August 13, 2020, Tata held a Teams meeting displaying slides that contained information concerning the new plan's compensation. (Dkt. 83-10). About a week later, on August 22, 2020, Tata sent each participant in the new plan their bonus incentive document, detailing the initial information necessary for them to discover their sales targets and potential bonuses, subject to Tata's disclaimers and discretion. (Dkt. 77-10).

The crux of this dispute is whether Tata paid Das the full amount of his bonus under the Sales Swat Tribe Plan's bonus incentive plan. Das claims that he was entitled to the maximum earning potential of $432,040 because he earned over $141,000,000 in total contract value, thus placing him in Tier 5 on the bonus incentive level. (Dkts. 23, 81). Tata counters that Tata paid Das the exact amount he earned, $97,290; his sales placed him into the Tier 1 level bonus because his total contract value was $79,322,324. (Dkts. 75, 76). Das' lone surviving claim is under the Illinois Wage Payment and Collection Act. ("IWPCA").

## LEGAL STANDARD

"Summary judgment is appropriate when the moving party shows 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Giovannelli v. Walmart Inc.*, 164 F.4th 1052, 1054 (7th Cir. 2026) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of

the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *Anderson*, 477 U.S. at 248. The movant "bears the burden of showing that summary judgment is appropriate" and that these requirements have been met. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). A "movant may prevail at summary judgment by showing an absence of evidence to support the non-movant's claims." *Upchurch v. Indiana*, 146 F.4th 579, 586 (7th Cir. 2025); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). To overcome a motion for summary judgment, the "nonmoving party must provide specific material facts showing there is a genuine issue for trial." *Tech. Sec. Integration, Inc. v. EPI Techs., Inc.*, 126 F.4th 557, 560 (7th Cir. 2025); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party who fails to produce evidence sufficient to show an element essential to his case on which he bears the burden cannot survive a summary judgment motion." *Gills v. Hamilton*, 164 F.4th 640, 644 (7th Cir. 2026).

## DISCUSSION

### I. Illinois Wage Payment and Collection Act

Tata and Bajaj assert that summary judgment is warranted because Das fails to establish the existence of a contract or agreement entitling him to wages under the IWPCA. (Dkt. 76 at 8-13). They further assert that, even if the August 13 PowerPoint slides (or any communications that occurred prior) created an agreement, the August 22 bonus incentive document itself superseded any agreement. (*Id.* at 13-14). They next contend that Das assented to the terms of the bonus incentive plan because—after receiving the bonus plan document—he continued working under it without objection. (*Id.* at 14-15). They maintain that Tata retained discretion under the plan, including over the amount of bonus (if any) and how Tata determined any bonus. (*Id.* at 15-16).

Lastly, they note that, per the terms of the bonus plan, Tata compensated Das as much as he was owed. (*Id.* at 16-17).

The precise agreement Das contends that the parties reached is unclear. He apparently points to several agreements. First, Das contends that there was an agreement that he would get paid per the "formula" presented in the August 13, 2020, PowerPoint, which, in his view, was identical to the formula that had been in place for a decade. (Dkt. 81 at 8-9).[2] By the same token, Das asserts that there was an oral agreement that if Das met his target he would make "as much and likely more than in years past." (*Id.* at 9). Second, Das asserts that the bonus incentive document (which Tata sent to Das on August 22, 2022) was itself an agreement. (*Id.* at 9-10). Third, Das points to the parties' past practices as showing an agreement. (*Id.* at 10-12). On this point, Das claims that Tata "never deviated from" its usual bonus payout process—it instead always paid its employees "per the published formula." (*Id.* at 10). Das asserts that Sanjeev Khanna and Ruchikar Dalela testified that they could not recall Tata ever deviating from the bonus incentive process and formula. (*Id.* at 11).[3] Das claims Amit Bajaj testified that Tata had a long-standing history of paying bonuses earned under the bonus incentives. (*Id.*) In support of this (and throughout his brief), Das relies on *Das v. Tata Consultancy Servs. Ltd.*, 118 F.4th 903 (7th Cir. 2024). (Dkt. 81 at 11). As he sees it, Tata snuck the Industry Sales Unit validation into the bonus payment process—which violated Tata's past practices—which, in turn, violated the agreement established under those past practices and the IWPCA. (*Id.* at 11-12).

Das also raises two new arguments that neither Tata nor Bajaj presented. (Dkt. 81 at 12-14). Das first asserts that a jury could find that Tata abused its discretion and thus violated its duty

---

[2] What Das calls the "formula" is just the chart breaking down how the bonus is paid. *See supra* pp. 2-3.

[3] During the time at issue, Khanna was a "group head" and the head of the Sales Swat Tribe group (Dkt. 83-4, Tr. 10:6-9); Dalela was Tata's country head for Denmark and involved in strategic initiatives spanning European geography as well as certain North American initiatives. (Dkt. 83-3, Tr. 8:20-9:2).

to act in good faith. (*Id*. at 12-13). His second point is that a jury could find that Tata paid him unlawfully. (*Id.* at 13-14). The basis for this argument turns on Das' contention that Tata failed to disclose a witness who presented a declaration in support of summary judgment for Tata, and, in Das' view, that warrants striking, sanctions, entry of default, and a ruling that any evidence Tata presented under that undisclosed witness is inadmissible. (*Id.*); (Dkt. 79).

On Reply, Tata and Bajaj note that Das' reliance on *Das v. Tata Consultancy Servs. Ltd.*, 118 F.4th 903 (7th Cir. 2024) is erroneous because that decision was made under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 87 at 2-3). They also point out that Das' failure to respond to several of their arguments results in waiver—including their arguments that (1) no oral statements established an agreement, (2) the August 13 PowerPoint was not an agreement, (3) Das' continued employment under the plan constituted acceptance, (4) the bonus incentive document superseded any prior agreement, and (5) Tata retained full discretion under the plan. (*Id.* at 3-7). They then respond to Das' arguments, reassert their primary bases for summary judgment, and maintain that, even if the Court strikes the Brijesh Singh declaration, entry of summary judgment is still proper. (*Id.* at 7-15).

To succeed on his claim, Das must "demonstrate that [he is] owed compensation from defendants pursuant to an employment agreement." *Das v. Tata Consultancy Servs. Ltd.*, 118 F.4th 903, 907 (7th Cir. 2024) (quoting *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016)); 820 ILCS 115/2. To "state a claim under the IWPCA, the existence of either an employment contract or agreement is required." *Hardy v. Vill. of Sauk Vill.*, 2024 IL App. (1st) 230834, ¶ 39 (brackets omitted) (quoting *Catania v. Local 4250/5050 of the Commc'ns Workers of America*, 359 Ill. App. 3d 718, 724 (2005)). "The employer need not be bound by a 'formally negotiated contract' for the employee to succeed." *Das*, 118 F.4th at 907 (quoting *Landers-Scelfo*

*v. Corp. Off. Sys., Inc.*, 356 Ill. App. 3d 1060, 1067 (2d Dist. 2005)). "An 'agreement' alone is sufficient, 820 Ill. Comp. Stat. 115/2, and an 'agreement' is nothing more than 'a manifestation of mutual assent on the part of two or more persons[.]'" *Id.* (quoting *Landers-Scelfo*, 356 Ill. App. 3d at 1067); *Samano v. Temple of Kriya*, 2020 IL App. (1st) 190699, ¶ 71 (a claimant must establish "facts showing mutual assent to terms that support the recovery") (quotes omitted).

"'An offer is an expression by one party of his assent to certain definite terms, provided that the other party involved in the bargaining transaction will likewise express his assent to the identically same terms. An offer looks forward to an agreement—to mutual expression of assent.'" *Kass v. PayPal Inc.*, 75 F.4th 693, 701 (7th Cir. 2023) (quoting *Calo, Inc. v. AMF Pinspotters, Inc.*, 31 Ill. App. 2d 2, 8 (1961)). "Whether parties have mutually assented to the terms of a contract is a question of fact." *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App. (1st) 210526, ¶ 20 (citing *Calo*, 31 Ill. App. 2d at 18); *Kass*, 75 F.4th at 701. "Employers and employees can manifest their assent to conditions of employment by conduct alone." *Samano*, 2020 IL App. (1st) 190699, ¶ 72, (quoting *Landers-Scelfo*, 356 Ill. App. 3d at 1068).

"Whether mutual assent or an intent to accept exists is determined by an objective standard." *Arbogast*, 2021 IL App. (1st) 210526, ¶ 20 (citing *McCarty v. Verson Allsteel Press Co.*, 89 Ill. App. 3d 498, 511 (1980)). "In other words, it is not necessary that the parties share the same subjective understanding as to the contract's terms, as it suffices if their conduct objectively indicates an agreement to the terms of the purported contract." *Id.* (citing *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 313-14 (1987)); *Kass*, 75 F.4th at 701. "Only the parties' overt acts and the communications between them may be considered in determining whether and upon what terms they have entered into a contract." *Id.* (citing *Motorola Sols., Inc. v. Zurich Ins. Co.*, 2015 IL App. (1st) 131529, ¶ 133).

"The most common way by which mutual assent can be shown is through a signature on a contract." *Id.*, ¶ 21 (citing *Hedlund & Hanley, LLC v. Board of Trs. of Cmty. Coll. Dist. No. 508*, 376 Ill. App. 3d 200, 206 (2007)). "However, it is also well settled that a party may, by acts and conduct, indicate assent to the terms of a written contract and become bound by its provisions, even though the party has not signed it." *Id.* (citing *Landmark Properties, Inc. v. Architects International-Chicago*, 172 Ill. App. 3d 379, 383 (1988)). "For a course of conduct to act as consent to a contract, it must be clear that the conduct relates to the specific contract in question." *Id.*

Das' failure to respond to five of Tata's and Bajaj's arguments results in waiver. *Hassebrock v. Bernhoft*, 815 F.3d 334, 342 (7th Cir. 2016) ("arguments not made in response to summary-judgment motion are waived") (citing *C & N Corp. v. Gregory Kane & Ill. River Winery, Inc.*, 756 F.3d 1024, 1026 (7th Cir. 2014)); *Samuel Gonzalez v. Vill. of Summit, et. al.*, 2026 WL 2517227, at *7 (N.D. Ill. Aug. 26, 2026) (finding that the nonmovant waived arguments by failing to respond on summary judgment). On this basis alone, the Court finds that entry of summary judgment is warranted as each argument stands as an independent basis to defeat Das' claim. *Id.*; *Reklau v. Merchants Nat. Corp.*, 808 F.2d 628, 630 n.4 (7th Cir. 1986) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so" it "loses the motion[.]") (quoting *Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983)); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (failing to raise a position in opposition to summary judgment deems the position abandoned); *see also De v. City of Chicago*, 912 F. Supp. 2d 709, 733 (N.D. Ill. 2012) (collecting cases holding same).

Even assuming Das did not waive his position on these five arguments, Das' position still fails. Recall that Das must present evidence from which a reasonable jury could find the requisite mutual assent to an agreement supporting the wages sought. Thus, if the undisputed evidence establishes that the parties did not mutually assent to such an agreement, Das cannot survive summary judgment. Because Das has failed to produce competent evidence raising a genuine issue of material fact as to mutual assent, Tata and Bajaj are entitled to summary judgment. The Court addresses each of the parties' positions in turn, but, before it does, it addresses Das' claim specifically against Bajaj.

The parties treat Tata and Bajaj as a single Defendant. They are not. To succeed on his claim, Das was required to show that Bajaj—the other named Defendant—violated the IWPCA. *See United States v. Domnenko*, 763 F.3d 768, 775 (7th Cir. 2014); *see also Raab v. Wendel*, 2019 WL 1060856, at *6 (E.D. Wis. Mar. 6, 2019) ("It is not the court's role to disentangle individual defendants from the pile into which the plaintiffs lump them and attempt to discern whether there might be evidence to sustain a claim against any particular defendant. It is the plaintiff['s] obligation to present their [evidence] against each defendant; the court's role is merely to determine whether what the plaintiffs present is sufficient."). To be sure, Das presented Bajaj's deposition testimony as evidence, but Das fails to explain how Bajaj violated the IWPCA—or even if he could. 820 ILCS 115/2; 820 ILCS 115/13. Bajaj testified that he was not responsible for "creating the compensation structure" of the Sales Swat Tribe Plan. (Dkt. 77-5, Tr. 24:1-10). Bajaj is not a proper Defendant in an IWPCA claim such as this; there is no evidence Bajaj "knowingly permit[ted]" Tata "to violate the provisions of this Act" because he was but a midlevel supervisor lacking sufficient control over Tata's payroll. 820 ILCS 115/13; *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d 101, 107-08 (2005) ("we refuse to believe that, in drafting section 2, the legislature set

out to make every supervisory employee strictly and personally liable for the payment of his or her subordinates' wages"). Seeking to hold Bajaj responsible for any purported violations committed by Tata under the IWPCA would create the very issues the IWPCA sought to avoid. It "could create personal liability for shareholders, officers, managers, and supervisory employees, regardless of the precision with which corporate formalities were observed, and would remove the fundamental protections afforded by long-standing principles of corporate law." *People v. Quality Therapy & Consultation, Inc.*, 2026 IL App. (1st) 241953-U, ¶ 26. "Such a ruling would have drastic consequences, in that it would deter business, it would discourage individuals from serving in managerial, decision-making capacities; and it would open the door to litigation that is not grounded in the true intent of the Wage Act[.]" *Id.* At any rate, Das fails to address this issue and thus abandoned it. (Dkt. 81); *supra* p. 8. The Court therefore dismisses Bajaj from this case and turns to Das' arguments against Tata.

There is no evidence Tata agreed to any "definite terms." *Kass*, 75 F.4th at 701. It is not even clear what those terms would be. Start first with Das' claim that the August 13 PowerPoint was an agreement whereby both parties mutually assented that Tata would pay Das per the terms of the PowerPoint. (Dkt. 81 at 8-9). No witness testified that they understood that these few PowerPoint slides were the final compensation plan for each individual. They all uniformly testified the exact opposite. When Dalela was asked, "Do you recall if this [(the PowerPoint)] was presented as the final sales incentive structure?" He responded: "No. We did not present it as a final sales structure." (Dkts. 77-3, Tr. 58:12-15). He called it "a work in progress." (*Id.*, Tr. 58:19). Amit Bajaj testified that the PowerPoint was merely "socializing the construct of the potential [Sales Swat Tribe] plan." (Dkt. 83-2, Tr. 48:22-23). Sanjeev Khanna called the meetings and presentations "concepts" the team was "thinking" about. (Dkt. 83-4, Tr. 22:18-22); (Dkt. 82, ¶ 34)

(Das conceding that the presentation "did not include specific details tailored to each of the SST participants, such as their target TCV or their overachievement targets"); (*see also id.*, ¶¶ 30-33, 35-38).[4] At any rate, Das' position is objectively unreasonable. No reasonable employee would understand a preliminary kickoff presentation as a binding agreement on an entire multinational company contracting them to pay—just the individuals who happen to be in attendance on that Teams Call—an undisclosed bonus based on factors unknown.

Likely recognizing the absurdity of his position that a couple of slides constitute a binding agreement, Das pivots that because the official bonus incentive document that Tata shared with him contained similar content as the PowerPoint slides (e.g., the chart and tier structure) that there was an agreement to pay him his bonus per the "formula" in the chart. (Dkt. 81 at 9-10). The problem is that Das does not understand how the bonus payment process works. Das assumes that the total contract value is the entire contract value *including* preexisting profits. (Dkt. 77-1, Tr. 162:18-20; 167:1-21) (Das understood "[t]he total monetary value of the contract is . . . the total contract value" and further understood that bonuses would be paid per the chart in the PowerPoint based on that definition of total contract value.). Das' position is objectively erroneous.

Remember that Das was in the Major Markets Unit where he was tasked with acquiring new clients. *Supra* pp. 1-3. Prior to Tata creating the Sales Swat Tribe Plan, when a Major Markets Unit salesman acquired a new client, they were the initial owner of that new client (and the contract under it). (Dkt. 77-5, Tr. 70:1-13). After a few years, Tata would then transfer those accounts from

[4] The Court finds these statements undisputed and deemed admitted. (Dkt. 82, ¶¶ 30-38). Das failed to present evidence showing any party understood the initial PowerPoint was a complete and binding agreement. (*Id.*) "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3); *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.13 (7th Cir. 2023) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.") (quoting *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015)); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

the Major Markets Unit to the Industry Sales Unit to maintain the client relationship. (*Id.*) The Sales Swat Tribe Plan changed all that.

Das, being on the Major Markets Unit side of the business, was thus tasked with creating *new* sales within *old* clients. (*Id.*, Tr. 72:5-73:14). The central fault in his position is his unsubstantiated assumption that his bonus is tied to—and that he may claim credit for—the entire contract value of Tata's existing clients—including all business he had no part in generating. (*See, e.g.*, Dkt. 81 at 1-2, 8-9). Assume for example T-Mobile had a total contract value of $70,000,000. If Das assisted in generating an additional $70,000,000 in contract value, he believes his bonus should have been based on $140,000,000 in total contract value. Whereas Tata based his bonus on just what Das actually earned: $70,000,000. In other words, Das is trying to take credit—and get paid—for work he did not do. There is no evidence—nor an issue of material fact—showing that Tata and Das had a meeting of the minds on how total contract value was defined under the Sales Swat Tribe Plan for purposes of calculating bonuses. Brijesh Singh averred that his "duties included ensuring that SST salespeople received credit for only the Total Contract Value . . . which they achieved in connection with the parameters and goals of the SST Initiative." (Dkt. 77-13, ¶ 4). "Specifically, this meant excluding from a salesperson's total TCV achievement any TCV opportunity which was achieved as a result of a renewal or extension of an existing opportunity, or TCV which was achieved with no selling effort by the SST salesperson." (*Id.*); (*see also id.*, ¶¶ 1-9).[5] Dalela testified that, because the Sales Swat Tribe Plan was working with the Industry Sales

[5] Das objects to the Singh declaration and moves to strike it—the Singh declaration is the foundation for Das' Motion for Sanctions. (Dkt. 81 at 13); (Dkt. 79); (Dkt. 82, ¶¶ 46-55). As discussed below, the Court denies Das' Motion for Sanctions. *Infra* pp. 16-20. Das presented no competing evidence in response to Tata's statements at paragraphs 46-55. (Dkt. 82, ¶¶ 46-55). "This results in all facts being deemed admitted." *Walker v. Costco Wholesale Corp.*,___F.Supp.3d___, 2026 WL 1045613, at *3 n.1 (N.D. Ill. Apr. 17, 2026) (ruling that movant's failure to respond to non-movant's statement of facts results in all facts being deemed admitted given that the "Court requires 'strict' compliance with its rules and procedures") (citing *McMahan v. Deutsche Bank AG*, 892 F.3d 926, 929 n.2 (7th Cir. 2018) ("We have consistently held that a failure to respond . . . as mandated by the local rules results in an admission.") (quotes omitted)). Das is therefore deemed to have admitted all of these statements (Dkt. 82, ¶¶ 46-55) and the Singh

Units' clients, they performed the process to "validate whether that achievement is really an achievement." (Dkt. 73-3, Tr. 94:13-18). Das admits that he had "no awareness of the existence of the ISU Validation Process, nor could he dispute the process occurred." (Dkt. 82, ¶ 61). When asked, "do you have any awareness of [the] ISU validation or verification process?" Das testified, "No." (Dkt. 77-1, Tr. 218:24-219:3); (*see also id.*, Tr. 226:3-227:11).

This precludes a finding that the parties mutually assented to the terms relating to the validation process of the purported agreement. A party cannot assent to terms that they are not aware of. Indeed, "[a]ssent to contractual terms requires knowledge of those terms; 'a party cannot assent to terms of which it has no actual or constructive' knowledge." *See Anand v. Heath*, 2019 WL 2716213, at *3 (N.D. Ill. June 28, 2019) (cleaned up) (quoting *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1066 (D. Nev. 2012)). Moreover, as mutual assent is judged objectively, it is out of the question to say that Tata and Das reached an agreement for Tata to pay Das (some unknown future amount) based on some unidentified formula from years past (despite those bonus structures each differing in kind) stemming from conduct he had not yet performed under terms unwritten and unknown to Das himself. *Arbogast*, 2021 IL App. (1st) 210526, ¶ 20; *McCarty*, 89 Ill. App. 3d at 511.

Das' last argument in support of finding an agreement is based on past practice. Das claims he "spent a decade at TCS being compensated precisely per formula: TCS set targets, communicated calculation methodology, and paid him to the dollar what its plans promised" and

declaration in full (Dkt. 77-13). *McMahan*, 892 F.3d at 929 n.2; *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 (7th Cir. 2019) (affirming finding facts admitted when party failed to properly respond); *Sentinel Ins. Co., Ltd. v. Majestic Auto Glass Inc.*, 2026 WL 663820, at *3 (N.D. Ill. Mar. 10, 2026) (statement of facts deemed admitted when party failed to respond); *Duran v. Chief Judge of Cir. Ct. of Cook Cnty.*, 2026 WL 663405, at *2 (N.D. Ill. Mar. 10, 2026) (same); L.R. 56.1(e)(2) ("In the event that the objection is overruled, the failure to admit or dispute an asserted fact may constitute a waiver."); Chief Judge Kendall Standing Order – Summary Judgment Motions ("CJK Standing Order") ("Failure to abide by the Local Rules may result in the Court striking briefs, disregarding statements of fact, deeming statements of fact admitted, or denying summary judgment.").

that Tata never "deviated" from this process. (Dkt. 81 at 1, 10-12). That's like saying a company had a past practice of hiring employees, giving them work, and paying them. Only in the broadest of brush strokes does it congeal, but even amongst the slightest scrutiny it dissipates. Das claims that there was an unbroken chain over a "decade" of Tata following this practice. (*Id.*) No evidence supports this. (Dkts. 77, 83). Setting aside that Das admits that the plan was brand new (Dkt. 82, ¶¶ 18-19), just the year prior Das concedes that Tata did not follow the purported "formula." (*Id.*, ¶ 17).[6] Rather, because of COVID, Tata "explicitly retained discretion with respect to Plaintiff's bonus plan and assessed an 80% performance factor to Plaintiff's bonus payment." (*Id.*)

Das asserts that Bajaj "repeatedly assured" Das that if he "met the Plan's objectives" he "would earn as much if not more than the year prior." (Dkt. 81 at 4). Das represents that "Bajaj does not deny saying this. Instead, he claims he 'cannot recall.'" (*Id.*)[7] By definition, there is no evidence showing a meeting of the minds if Bajaj cannot recall ever saying what Das asserts he said.[8] "As there was no meeting of the minds, the agreement was never validly formed." *BKA Holding, LLC v. Sam*, 2023 IL App. (2d) 230163, ¶ 20. Nor is there an issue of material fact because Das did in fact get paid more under the new plan than in 2020. (*Compare* Dkt. 77-14 (Tata

[6] Das claims this statement is "disputed," but he cited no evidence. (Dkt. 82, ¶ 17). It is therefore undisputed and deemed admitted. L.R. 56.1(e)(3); *Johnson*, 71 F.4th at 611 n.13; *Curtis*, 807 F.3d at 218; *Cracco*, 559 F.3d at 632.

[7] The Court notes that Das' statement that Bajaj did not deny making that statement is misleading. A deponent stating that they cannot recall something is not the same as saying they did not deny it.

[8] During the parties' depositions, Plaintiff's Counsel repeatedly affronted Defendants' Counsel because Defendants' Counsel would object on the basis of "form." In Plaintiff's Counsel's view, "[a] form objection isn't an objection." (Dkt. 83-3, Tr. 61:9-10). That is incorrect. In fact, failing to object to "the form of a question" results in waiver. Fed. R. Civ. P. 32(d)(3)(B)(i)-(ii) ("An objection to an error or irregularity at an oral examination is waived if . . . it relates to . . . the form of a question . . . and it is not timely made during the deposition."); *see also* Fed. R. Civ. P. 30 advisory committee's note (1993) (objections "should be limited to those that under Rule 32(d)(3) might be waived if not made at that time, *i.e.*, objections on grounds that might be immediately obviated, removed, or cured, such as to the form of a question or the responsiveness of an answer."). Objections to form are proper and indeed preferred as they avoid the issues the Federal Rules prohibit: talking objections, coaching the witness, and unprofessional conduct during depositions. Fed. R. Civ. P. 30(c)(2); *see, e.g.*, *Kirschner v. Broadhead*, 671 F.2d 1034, 1037 (7th Cir. 1982); *Zeikos, Inc. v. Walgreen, Co.*, 2025 WL 2696409, at *5 (N.D. Ill. Sept. 22, 2025); *Sava v. 21st Century Spirits, LLC*, 2024 WL 6935019, at *1 (N.D. Ill. Nov. 27, 2024); *Medline Indus., Inc. v. Wypetech, LLC*, 2020 WL 6343089, at *5 (N.D. Ill. Oct. 29, 2020); *Otis v. Demarasse*, 399 F. Supp. 3d 759, 767 (E.D. Wis. 2019); *Pain Ctr. of SE Indiana, LLC v. Origin Healthcare Sols. LLC*, 2015 WL 5775455, at *2 (S.D. Ind. Sept. 30, 2015). The Court sustains each of Defendants' Counsel's objections on the basis of form.

paying Das $97,290 in 2021) *with* Dkt. 77-4 (Tata paying Das $87,280 in 2020)). At any rate, Das' entire position is undermined because he cannot decide on how much he was apparently entitled to. First, it was "more than $300,000." (Dkt. 81 at 1). Then it was "more than $400,000." (*Id.* at 2). And then it was "the maximum incentive compensation of $432,040." (*Id.* at 5). Das proffered no expert to substantiate his figures. The Court ran the numbers. Even accepting Das' position, his asserted amount lacks support.

Lastly, Das' assertion that Tata abused its discretion is unfounded. (Dkt. 81 at 12-13). The bonus incentive document has an entire page, single spaced, filled with clear and explicit disclaimers and discretionary warnings. It states that "[e]ligibility of these funds is based on numerous factors, including but not limited to the success of the business in achieving its earning goals, as well as by the individual contribution of each employee to business goals, as determined by business management." (Dkt. 77-10 at 3). It further states that "[a]ny incentive bonus payment made to an individual under the Plan is made at the sole discretion of the Corporate Vice President — Markets, TCS Global CFO and TCS Global Head of HR" and that it "is at the sole and total discretion of management whether there is any bonus, the amount, timing, and whether individual employees are rewarded, and such determination will be based on multiple variables including, but not limited to, the associate and the unit's contribution." (*Id*.) Tata was explicit that the bonus was discretionary and subject to "many factors." (*Id*.) This language is unambiguous and accurate. The validation process under the new plan was an exercise in discretion—determining what constitutes a new sale, a new contract versus a mere renewal, and degree of sales efforts necessary for a bonus was not a cut and dry process. (Dkt. 77-13, ¶¶ 4, 6-8); (Dkt. 77-6, Tr. 26:9-15); (Dkt. 82, ¶¶ 43-44, 46-56).[9]

[9] Das objects to paragraphs 43, 44, and 56 asserting that they are improper because "Nair's deposition is not based on first-hand knowledge, instead it is based on testimony regarding what his 'team' did," and so Das moves to strike "the

## II. Sanctions

Das claims that Tata "concealed the identity of the one witness who made the decision at the heart of this case": "Brijesh Singh." (Dkt. 79 at 1). He claims Singh "single-handedly excluded $28.8 million in TCV from [his] validated compensation," yet appears "nowhere in Defendants' discovery disclosures." (*Id.*) Das identifies Interrogatories, his Rule 37 letter, email communications, and Tata's Rule 26 disclosures, and then posits that Tata's failure to identify Singh was a "calculated litigation strategy that has allowed Defendants to withhold key evidence until the moment [they] could do the most damage with the least accountability," warranting the most severe sanction: default judgment against Tata. (*Id.*); (*see also id*. at 2-7).

Das asserts that the Court should sanction Tata in a number of ways, including by striking Tata's statement of fact paragraphs 46-55 (Dkt. 82, ¶¶ 46-55), the Declaration of Brijesh Singh (Dkt. 77-13), "any statement of material fact that relies exclusively upon it," or Tata's entire Motion for Summary Judgment. (Dkt. 79 at 7). If the Court strikes Tata's Motion for Summary

---

portions of Nair's declaration which talk about what others did[.]" (*See* Dkt. 82, ¶¶ 43, 44, 56). Das' position is unfounded. The Nair declaration is adequately based on his personal knowledge. (Dkt. 77-11, ¶ 2). During the relevant time, Nair was the Head of Total Rewards for North America. (*Id.*, ¶ 3). His responsibilities were to oversee a team that prepared and finalized the compensation documents Tata sent to its employees. (*Id.*) His averments about what his team did is within his personal knowledge—it is central to his role. (*Id.*, ¶¶ 4-13). The broad notion that a supervisor cannot testify as to what his subordinates are doing is wrong. To be proper, the Nair declaration must comport with Federal Rule of Civil Procedure 56(c)(4), (e) and Federal Rule of Evidence 602. *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). It does. *Id.*; *see O'Grady v. Commonwealth Edison Co.*, 2010 WL 4223212, at *3 (N.D. Ill. Oct. 19, 2010) (rejecting objection to supervisor declaration); *Laborers' Pension Fund v. RAI Concrete, Inc.*, 2021 WL 4146888, at *4 (N.D. Ill. Sept. 11, 2021) (rejecting objection to supervisor declaration and ruling that "[a]s the supervisor of the employees . . . [Nicola] would have personal knowledge as to their hours, method of payment, and so on."); *compare with Anderson v. Credit Bureau Collection Servs., Inc.*, 422 F. App'x 534, 538 (7th Cir. 2011). Das provides no other basis to support his objection and motion. (Dkt. 82, ¶¶ 43, 44, 56). Das also violated this Court's Standing Order and the Local Rules. "The Court requires strict compliance with Rule 56.1(e)(2) which provides in part as follows: 'Motions to strike all or portions of an opposing party's LR 56.1 submission are disfavored. If a party contends that its opponent has included objectionable or immaterial evidence or argument in a LR 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief. In the event that the objection is overruled, the failure to admit or dispute an asserted fact may constitute a waiver.'" CJK Standing Order. The Court therefore overrules Das' objections, denies his motion to strike, and finds that Das is deemed to have admitted Dkt. 82, ¶¶ 43, 44, 56 and the Dharesh Nair Declaration (Dkt. 77-11) in full. Das' admission here is fatal to his case because he is now deemed to have admitted that his total contract value was "$79,322,324" and that, based on this, he was only "eligible to receive a total bonus payment of $97,283 in connection with the SST initiative." (Dkt. 77-11, ¶¶ 8, 11).

Judgment, Das further requests an adverse inference "directing the jury that Defendants concealed Singh's identity throughout discovery[.]" (*Id.*) The ultimate sanction Das seeks is for the Court to enter default judgment in his favor and to award him attorneys' fees. (*Id.* at 5-7).

Tata responds that it complied with Rule 26 and thus no Rule 37 sanctions should follow. (Dkt. 89 at 2-3). Tata notes that Das himself disclosed Brijesh Singh on his own Rule 26(a) disclosures and thus the notion that Tata concealed Singh's identity is false. (*Id.*) Tata states that its discovery disclosed (or at least stated) Singh's name nearly 200 times, further showing that Das' failure to depose or seek discovery concerning Singh was his own decision. (*Id.* at 3-5). Tata notes that the lone case Das relies on is adverse to his position and that the Seventh Circuit favors its position, it further claims that the Rule 37 factors favor it, that it is entitled to summary judgment even if the Singh declaration is stricken, and it seeks fees for being forced to respond to Das' motion. (*Id.* at 5-8).

Das' Motion for Sanctions is absurd if not an outright misrepresentation. Das was the one who disclosed Brijesh Singh in the first place in his own Rule 26(a) disclosures. (Dkt. 89-1 at 9). How can Tata conceal a witness that Das has known about since day one? At any rate, a party must supplement their Rule 26 disclosures unless "the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Das has always "known" about Singh. *Id.*; (Dkt. 89-1 at 9). Singh was also disclosed during discovery. (Dkt. 89 at 3-5). "There is . . . no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process[.]" Fed. R. Civ. P. 26 advisory committee's note (1993). Tata did not violate Rule 26. *Id.*

Even if failing to include Singh in Tata's disclosures violates Rule 26, this scenario here is the definition of harmless. Fed. R. Civ. P. 37(c)(1). It is indeed the very example the advisory committee uses to show when a failure to disclose is harmless under Rule 37: "the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party." Fed. R. Civ. P. 37 advisory committee's note (1993).

Das' complaint that Tata's responses to Das' Interrogatories were incomplete and thus warrant sanctions, lacks merit. (Dkt. 79 at 2-3, 6). For starters, it is untimely. Fact discovery closed on December 22, 2025. (Dkt. 68). Fed. R. Civ. P. 6(b)(1)(B). Das fails to address the timeliness issue. (Dkt. 79). He also fails to cite the correct rule: responses to Interrogatories are governed by Rule 33. The substance of his position is also baseless. Das' Interrogatories are incredibly broad and vague. (Dkt. 79-1). Moreover, given Singh's role, it is far from clear he is responsive to what Das' Interrogatories seek. He is not responsive to Interrogatory Nos. 2 or 7 and, while he perhaps falls under Interrogatory No. 4, that is because it is overbroad. (*Id.*) At any rate, Das' points here are moot because he never timely sought relief. "Rule 37 is not self-executing." *Khanna v. Banks*, 2026 WL 2836748, at *12 (N.D. Ill. Sept. 22, 2026). Had Das believed Tata's responses were improper, and if Tata's responses to Das' Rule 37 discovery letter did not cure the issues, Das' next step would have been to file a motion to compel. *See id.* (discussing impropriety of seeking untimely discovery sanctions). He did not. Das could have deposed Singh. He also did not. Those were his decisions. In so doing, he accepted Tata's responses for what they were.

Despite seeking extreme case ending sanctions, Das cites but a single non-binding unpublished case that is adverse to his position. (Dkt. 79 at 6) (citing *Fermaint v. Planet Home Lending, LLC*, 2020 WL 13929939, at *4 (N.D. Ill. Apr. 30, 2020) (recommending denying motion

for sanctions), *rep. & rec. adopted*, 2020 WL 13930275 (N.D. Ill. May 21, 2020)). The remainder of Das' position is wholly unsupported and comes nowhere close to the standard necessary for default judgment. "[I]t [is] clear that a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point." *Doe By & Through G.S. v. Johnson*, 52 F.3d 1448, 1457 (7th Cir. 1995) (quotes omitted); *Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 190 (7th Cir. 2011) (dismissal under Rule 37 "requires a finding of willfulness, bad faith or fault on the part of the defaulting party"). Das' motion is frivolous. The Court denies it and holds that Das is deemed to have admitted paragraphs 46-55 and the Declaration of Brijesh Singh in full. (Dkt. 82, ¶¶ 46-55); (Dkt. 77-13).

Lastly, Tata seeks to recover its attorneys' fees from being forced to respond to Das' Motion for Sanctions. (Dkt. 89 at 7-8); (Dkt. 89-1) (seeking to recover $39,622 in fees). There is no question that Das' Motion for Sanctions was but a Hail Mary seeking to belatedly fix his discovery failures. Das' claim that these fees are "shocking" is disingenuous. (Dkt. 90 at 11 n.1). Das forgets what he asked the Court to do and thus what he forced Tata to respond to. From default judgment to an adverse inference against Tata, Das' requested relief was severe. (Dkt. 79 at 5-8). Das quite literally sought the most extreme sanction of all. (*Id.*) That Tata only spent $39,622 defending against what, potentially, could have cause the harshest sanction available to a party, is reasonable. At any rate, "[t]he Court presumes that [Tata's] attorneys' billing rate 'is appropriate to use as the market rate.'" *Tom Lazar v. Wheels, Inc.*, 2026 WL 2517308, at *1 (N.D. Ill. Aug. 26, 2026) (quoting *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011)). The simple fact is this: discovery is meant to learn not only about your client's case, but also your opponent's. Das failed to discover how his bonus was calculated. He cannot, after every deadline

has passed, seek to sanction the other party for his own failures. Das made his "decisions with full knowledge of the consequences, he must now live with their ramifications." *Id.*

**CONCLUSION**

The Court grants Defendant Tata's Motion for Summary Judgment. (Dkt. 75). The Court grants Tata's Motion for Fees. (Dkt. 89). Das is ordered to pay Tata $39,622 within two weeks of this Order. The Court denies Das' Motion for Sanctions. (Dkt. 79).

Virginia M. Kendall
United States District Judge

Date: September 30, 2026